## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**HOUSING OPPORTUNITIES**
**MADE EQUAL OF GREATER**
**CINCINNATI, et al.,**

                **Plaintiffs,**

      **v.**

**COUNT X LLC, et al.,**

              **Defendants.**

        **Case No. 1:24-cv-308**

        **JUDGE DOUGLAS R. COLE**

### OPINION AND ORDER

After Plaintiffs Housing Opportunities Made Equal of Greater Cincinnati (HOME), Sophia Smith, and Demeirakle Carter sued over discriminatory housing practices, Defendants Count X LLC (Count X) and M. Aaron Taylor counterclaimed. Plaintiffs now move to dismiss those counterclaims. For the reasons stated more fully below, the Court **GRANTS** Plaintiffs' Motion to Dismiss Defendants' Counterclaims (Doc. 9), and **DISMISSES WITHOUT PREJUDICE** Defendants' Counterclaims (Doc. 7).

### BACKGROUND

Plaintiffs filed this lawsuit, alleging that Defendants engaged in discriminatory housing practices in violation of federal, state, and local law. (Compl., Doc. 1, #15–21). Defendants, however, deny that they violated any fair housing or anti-discrimination laws. (Answer & Countercl., Doc. 7, #74–82). And Defendants upped the ante by firing off two counterclaims against Plaintiffs: tortious interference with a business relationship and defamation. (*Id.* at #84–86).

At this stage, then, the Court has two competing factual narratives before it. But for purposes of this Opinion and Order, the Court accepts Defendants' allegations related to their counterclaims as true to the extent that they differ from Plaintiffs' allegations since Plaintiffs are the ones seeking dismissal of those counterclaims. The Court's reliance on Defendants' allegations, though, comes with the typical caveat that at this point they are just that—allegations.

Before turning to the dispute, a little background about the parties is in order. Start with Defendants. Count X is a limited liability company that manages residential rental properties in Hamilton County, Ohio. (Doc. 7, #83). Taylor is Count X's managing member, who also personally owns some of the properties Count X manages. (*Id.* at #84). And importantly, Cincinnati Metropolitan Housing Administration (CMHA)—who is *not* a party to this case—administers Section Eight subsidies for some of the rental units that Defendants own and manage. (*Id.*).

Turning to Plaintiffs, Smith rents one of the rental properties that Taylor owns and Count X manages. (Doc. 1, #5, 7; Doc. 7, #76–77). Smith's disabled son, Carter, also lives at that rental property (along with Smith's five other minor children). (Doc. 1, #5 & n.1, 7 & n.2; Doc. 7, #77). And Smith receives a voucher from CMHA to help pay her rent. (Doc. 1, #7). HOME, for its part, is a non-profit corporation that "advocates and enforces housing regulations" to "eliminate unlawful discrimination in housing for the Greater Cincinnati area." (*Id.* at #4).

Now the main event: the ongoing dispute that gave rise to this action. Everyone agrees that in 2024 Smith and Carter moved into a rental property Taylor owns and

Count X manages. (*Id.* at #5, 7; Doc. 7, #76–77). Beyond that, though, the parties' stories differ.

Start with Plaintiffs' telling (which the Court relays only to provide context for Defendants' counterclaims). Smith and Carter say their experience with Defendants was troublesome from the start. Smith first complains that Defendants (including one of Count X's agents, Ms. Z) pressured her into signing a lease agreement that contained provisions which discriminated on the basis of familial status. (Doc. 1, #7–8, 10). Then she claims that Defendants failed multiple Section Eight inspections and never made the post-inspection repairs required to make her unit fit and habitable. (*Id.* at #8–9). Smith next points to various skirmishes she had with Taylor. In essence, Smith says that Taylor repeatedly showed up at her unit without notice (twice with a firearm), made sexually suggestive comments to her minor daughter, called Carter a "retard," and generally harassed her family. (*Id.* at #8–9). Smith also claims that Taylor had her car towed to further harass her. (*Id.* at #9).

All that led Smith to contact HOME for help. (*Id.* at #8, 11). HOME began to investigate Defendants' practices. (*Id.* at #8, 11). According to HOME, that investigation revealed that Defendants had been engaging in several discriminatory practices that violate federal, state, and local housing and anti-discrimination laws. (*Id.* at #11–12). After efforts at resolving the various issues apparently proved unsuccessful, HOME resorted to filing administrative complaints against Defendants with the United States Department of Housing and Urban Development. (*Id.* at #12).

To round it all out, Smith alleges that Defendants sent her a notice to vacate her property in retaliation for the actions she and HOME took. (*Id.* at #11). So, on June 3, 2024, Plaintiffs collectively filed this lawsuit alleging violations of: the Fair Housing Act of 1968, as amended (Count I); the Ohio Civil Rights Act (Count II); the Ohio Landlord-Tenant Act (Count IV); and Cincinnati's rental late fee cap ordinance (Count V). (*Id.* at #15–21). They also assert a tort claim for negligent training and supervision (Count III). (*Id.* at #17–18).

Defendants disagree with almost all of Plaintiffs' version of events. In their Answer, they deny violating any of the relevant federal, state, or local laws. (Doc. 7, #74–83). Beyond that, they add a few takes of their own. For example, they say that they could not make the necessary repairs to Smith's unit because she blocked them from accessing it, (*id.* at #77–78); that Defendants repeatedly gave Smith notice they would be accessing her unit to make repairs (which she ignored), (*id.* at #78); that they towed Smith's vehicle because it was improperly parked, (*id.*); and that they ultimately issued the notice to vacate because Smith had repeatedly violated her lease, (*id.* at #79).

Perhaps more germane to this Opinion and Order, Defendants also asserted two counterclaims, which presumably arise under Ohio law (they didn't specify). First, they allege that HOME tortiously interfered with a beneficial business relationship Defendants have with CMHA. (*Id.* at #84–85). Specifically, Defendants contend that HOME, aware of that relationship, "deliberately engaged in a course of action" to prevent future contracts and terminate existing contracts between Count

4

X and CMHA without any privilege to do so. (*Id.* at #85). And as part of that course of action, Defendants point to HOME "manufacturing false evidence" and "coaching and targeting prospective tenants with known propensities to be disruptive to Count X business interests and management," although they provide no further details about either. (*Id.* at #84). Second, Defendants allege that HOME, Smith, and Carter defamed them by publicly and falsely accusing Defendants of discriminatory housing practices, again without privilege to make such statements. (*Id.* at #85). Although they fail to allege the contents of any particular statements, to whom they were made, where, or when.

Plaintiffs now move to dismiss Defendants' Counterclaims for failure to state a claim. (Doc. 9). Defendants declined to respond. And because the time to respond has long since passed, *see* S.D. Ohio Civ. R. 7.2(a)(2), the motion is now ripe.

## LEGAL STANDARDS

Plaintiffs move to dismiss Defendants' Counterclaims under Rule 12(b)(6). So the Court must consider whether Defendants have "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In making that determination, the Court must "construe [the Counterclaims] in the light most favorable to [Defendants], accept [their] allegations as true, and draw all reasonable inferences in [Defendants'] favor." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quotation omitted). That is so, however, only as to well-pleaded factual allegations. The Court need not accept "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). Likewise, the

Court need not accept as true any legal conclusions alleged in Defendants' Counterclaims. *Id.* "[L]abels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice. *Id.* (quotations omitted).

At the pleadings stage, a claim must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020). So to survive a motion to dismiss, Defendants "must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.* In sum, the well-pleaded facts must be sufficient to "raise a right to relief above the speculative level," such that the asserted claim is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

## A. Plaintiffs' Motion Is Unopposed.

At the outset, the Court concludes that Plaintiffs' motion to dismiss is unopposed. Plaintiffs moved to dismiss Defendants' Counterclaims on December 9, 2024, (Doc. 9), so Defendants' response was due December 30, 2024, *see* S.D. Ohio Civ. R. 7.2(a)(2). Defendants, however, have not filed one to date.

In light of Defendants' failure to respond to Plaintiffs' motion, the Court concludes that Plaintiffs' motion is unopposed, *see Layne v. Thouroughman*, No. 1:23-cv-702, 2024 WL 3068872, at *3–4 (S.D. Ohio June 20, 2024), which means Defendants have "waived opposition to the motion," *Humphrey v. U.S. Att'y Gen.'s Off.*, 279 F. App'x 328, 331 (6th Cir. 2008) (quoting *Scott v. Tennessee*, 878 F.2d 382,

1989 WL 72470, at *2 (6th Cir.1989) (Table), along with any arguments they could have otherwise presented.

**B. Defendants Failed to Plausibly Allege Their Counterclaims.**

The Court could perhaps grant Plaintiffs' motion to dismiss based solely on the waiver that arose from Defendants' failure to respond. *Layne*, 2024 WL 3068872, at *4. Nonetheless, the Court will briefly review the motion. At day's end, the result is the same; dismissal is warranted.

Defendants assert two counterclaims: tortious interference with a business relationship and defamation. And while they did not specify what law governs those claims, the Court presumes that Ohio law applies. Plaintiffs argue that Defendants failed to state a plausible claim for either one. The Court takes each in turn.

**1. Tortious Interference with a Business Relationship[1]**

Defendants first allege that HOME tortiously interfered with Count X's business relationship with CMHA. Specifically, Defendants claim that HOME is attempting both to terminate existing rental contracts and to prevent future rental contracts between Count X and CMHA. (Doc. 7, #84–85). As the Court analyzes the sufficiency of this claim, recall that Count X's relationship with CMHA is premised

---

[1] Defendants labeled their counterclaim "Tortious Interference With Beneficial Business Contract." (Doc. 7, #84). The Court is therefore unclear whether Defendants meant to allege tortious interference with a contract or tortious interference with a business relationship, as the two claims are distinct. *Gentile v. Turkoly*, 86 N.E.3d 991, 997 (Ohio Ct. App. 2017) (outlining the elements for the two flavors of tortious interference claims). That said, Defendants allege that a "*business relationship* exists between Count X and [CMHA]." (Doc. 7, #85 (emphasis added)). And Plaintiffs' motion argues for dismissal based on the tortious-interference-with-a-business-relationship framework. (Doc. 9, #94–95). So the Court assumes that is the form of tortious interference Defendants meant to plead. Defendants, moreover, have waived any argument they might have otherwise raised on this front. *See supra* Part A.

on CMHA administering Section Eight subsidies for some of the rental units Count X manages. (*Id.* at #84).

To state a claim for tortious interference with a business relationship, Defendants must plausibly allege: "(1) a business relationship …; (2) [Plaintiffs'] knowledge of the relationship …; (3) [Plaintiffs'] intentional or improper action taken to … terminate a business relationship; (4) a lack of privilege; and (5) resulting damages." *Woods v. Sharkin*, 192 N.E.3d 1174, 1198 (Ohio Ct. App. 2022). Plaintiffs argue that Defendants failed to plausibly allege the third, fourth, and fifth elements. (Doc. 9, #95–98). The Court agrees as to elements three and five, and therefore need not analyze the fourth element.[2]

Start with the third element: whether HOME intentionally or improperly interfered in Count X's and CMHA's relationship. Defendants' sparse allegations don't meet the plausibility threshold here. Defendants baldly state that HOME "deliberately engaged in a course of action calculated and intended to prevent future contracts" and to "terminat[e] existing contracts between Count X and [CMHA]." (Doc. 7, #85). But those conclusory allegations do not allege *facts* plausibly suggesting

---

[2] Plaintiffs make much of the argument that their "actions in this matter are entitled to absolute privilege." (Doc. 9, #96–98 & n.3). They seemingly rest that argument on the notion that "filing [] a lawsuit … is privileged conduct." (*Id.* at #96). That may be so. But the case to which Plaintiffs point for support found that where a tortious interference claim is based "*solely*" on filing a lawsuit, the claim cannot proceed because suing to resolve a dispute is privileged conduct. *Ethicon Endo-Surgery, Inc. v. Crescendo Techs., LLC*, No. 1:07-cv-1016, 2008 WL 11351572, at *3 (S.D. Ohio May 7, 2008) (emphasis added). Here, however, the Court does not understand Defendants' tortious interference counterclaim to rest solely on Plaintiffs filing this lawsuit—indeed, the allegations do not mention filing a lawsuit at all. (*See* Doc. 7, #84–85). In any event, because the Court concludes that the counterclaim fails to state a claim for other reasons, it need not resolve the privilege issue.

that HOME intentionally or improperly interfered with a business relationship. *See Iqbal*, 556 U.S. at 678. True, Defendants also allege that HOME has "manufactur[ed] false evidence by coaching and targeting prospective tenants with known propensities to be disruptive to Count X business interests and management." (Doc. 7, #84). But it is unclear what "false evidence" HOME has allegedly manufactured or how that evidence has interfered with Count X's relationship with CMHA. Beyond that, Defendants have failed to explain just *how* HOME's alleged coaching and targeting of prospective tenants has interfered with Count X's business relationship with CMHA. In other words, Defendants do not allege what that "coaching" and "targeting" entailed (or how it caused disruption to the business relationship, but more on that later). Sure, if the coaching and targeting convinced prospective tenants not to enter leases or convinced current tenants to terminate existing leases with Count X, that may be enough. But Defendants failed to allege *facts* suggesting that occurred. Defendants, therefore, miss the mark in plausibly alleging this element.

And Defendants fare no better on the fifth element: damages. As Plaintiffs highlight, (Doc. 9, #97), Defendants allege no facts from which the Court can reasonably infer that they suffered damages because of HOME's alleged interference. The closest Defendants come is alleging that HOME's conduct has been "disruptive to Count X business interests." (Doc. 7, #84). But disruption is not the same as termination or a decision not to enter a relationship. *See Emanuel's LLC v. Restore Marietta, Inc.*, 206 N.E.3d 116, 126 (Ohio Ct. App. 2023) (explaining that the essence of the cause of action is that "a third party does not enter into or continue a business

relationship" with the claimant (quotation omitted)). And Defendants offer no facts suggesting that HOME's conduct caused CMHA to terminate its existing business relationship with Count X (or otherwise refuse to administer future rental subsidy agreements). Nor did Defendants plead facts suggesting that they lost current or prospective tenants for whom CMHA administered subsidies (or would have administered subsidies). They also fail to explain how the alleged "disruption" to their business interests has caused them any compensable damages.

In sum, "[a]bsent some factual allegation that [HOME's] actions ended or prevented a business relationship, [Defendants] do[] not state a claim." *Wilkey v. Hull*, 366 F. App'x 634, 638 (6th Cir. 2010) (citing *Smith v. Ameriflora 1992, Inc.*, 644 N.E.2d 1038, 1044 (Ohio Ct. App. 1994)). Defendants failed to plausibly allege both that Plaintiffs intentionally or improperly interfered with Count X's and CMHA's business relationship (element three), and that they suffered damages as a result (element five). So the Court dismisses Defendants' first counterclaim.

### 2. Defamation

But perhaps all is not lost. Defendants also allege that Plaintiffs defamed them by "publicly and repeatedly accus[ing] [Defendants] of discriminatory practices," knowing those accusations were false. (Doc. 7, #85).

"Defamation is a false publication that injures a person's reputation." *Fisher v. Ahmed*, 153 N.E.3d 612, 624 (Ohio Ct. App. 2020) (quotation omitted). To state a claim for defamation (whether slander or libel), Defendants must plausibly allege that (1) Plaintiffs made a false and defamatory statement, (2) that statement was

published, (3) thus injuring Defendants, and (4) Plaintiffs acted with the required degree of fault. *Rhoads v. Olde Worthington Bus. Ass'n*, 246 N.E.3d 87, 104 (Ohio Ct. App. 2024); *Mitchell v. Fujitec Am., Inc.*, 518 F. Supp. 3d 1073, 1092 (S.D. Ohio 2021) (explaining that in federal court, state-law defamation claims need only meet Federal Rule of Civil Procedure 8's pleading standard, which in turn, requires "plausibility"). The Court decides "as a matter of law whether certain statements alleged to be defamatory are actionable or not." *Am. Chem. Soc'y v. Leadscope, Inc.*, 978 N.E.2d 832, 853 (Ohio 2012) (quotation omitted).

Sometimes, though, privilege doctrines may cause even a plausibly alleged defamation claim to fail. If, for example, the party that made the allegedly defamatory statement did so in a judicial proceeding, then that party "enjoys an absolute privilege against [the] defamation action as long as the [] statement is reasonably related to the proceeding in which it appears." *Jackson v. Rental*, 252 N.E.3d 618, 620 (Ohio Ct. App. 2024) (quoting *Hecht v. Levin*, 613 N.E.2d 585, 587 (Ohio 1993)).

Plaintiffs raise just such an argument here. Specifically, they contend that (1) the statements they allegedly made were not defamatory, and in any event, (2) they're protected by the absolute privilege doctrine because Defendants defamation claim centers on accusatory statements Plaintiffs allegedly made when they filed this lawsuit. (Doc. 9, #98–101).

Ultimately, the Court agrees that Defendants fall short of plausibly alleging a defamation counterclaim, though it parts ways to some extent on the privilege point. Start with the sufficiency of Defendants' allegations. Most are conclusory at best, (*see*

Doc. 7, #85 (alleging defamation by essentially reciting the elements of a defamation claim)), and therefore "do not suffice" to state a claim, *Iqbal*, 556 U.S. at 678. And Defendants' sole allegation that *does* contain some factual basis—that Plaintiffs "publicly and repeatedly accused [Defendants] of discriminatory practices," (*id.*)—doesn't clear the threshold either. Accepting that allegation as true, in determining whether Plaintiffs' allegedly false statements are defamatory, the Court could perhaps infer that accusations of discriminatory rental practices may "injure [Defendants] in [their] trade or occupation," which is one class of defamation per se.[3] *Green v. Mason*, 504 F. Supp. 3d 813, 833 (S.D. Ohio 2020) (quoting *McClure v. Ohio Dep't of Rehab. & Corr.*, 2020-Ohio-1035, ¶ 11 (10th Dist.)). But that single non-conclusory allegation, which provides virtually no detail about the actual substance of the allegedly defamatory statements, seems a thin reed on which to hang a defamation claim. *See Mitchell*, 518 F. Supp. 3d at 1093 ("[A] defamation complaint must allege the substance of the allegedly defamatory statements[.]" (quotation omitted)); *Am. Chem. Soc'y*, 978 N.E.2d at 853 (explaining that "a court must review the totality of the circumstances … to determine whether a reasonable reader would interpret [the statement] as defamatory" (cleaned up)). And because of the allegation's barebones nature, the Court has additional concerns about whether Defendants have plausibly alleged other elements of their defamation counterclaim.

---

[3] Defendants didn't bother to specify which form of defamation they intend to press: defamation per se or defamation per quod. *McClure v. Ohio Dep't of Rehab. & Correction*, 2020-Ohio-1035, ¶ 11 (10th Dist.) (explaining the difference between the two). So the Court assumes Defendants are asserting a defamation per se claim since they didn't plead special damages, which defamation per quod requires. *Id.* ¶ 12.

But to address those concerns, the Court turns to Plaintiffs' second argument for dismissal.

As noted, Plaintiffs further believe that under the absolute privilege doctrine, Defendants' defamation counterclaim necessarily fails since it's premised solely on statements Plaintiffs made in their "publicly filed Complaint." (Doc. 9, #99). The Court, however, isn't necessarily convinced that Defendants' defamation counterclaim hinges solely on accusatory statements Plaintiffs made in filing the instant Complaint. Indeed, Defendants do not claim that Plaintiffs' *legal* allegations asserted in this lawsuit defamed them; Defendants merely allege that Plaintiffs "publicly and repeatedly accused" them of discriminatory practices. (Doc. 7, #85). But there's the rub—neither Plaintiffs nor the Court can tell what allegedly false accusations support Defendants' defamation counterclaim. Alleging that Plaintiffs "publicly" accused Defendants of "discriminatory practices" could mean that Plaintiffs posted something online, sent out a flyer, made a statement in an interview, or simply filed this lawsuit. Without more factual footing in the allegations, the Court cannot be sure. And in that way, Defendants fail to plausibly allege the publication element of their defamation claim. That is, Defendants have not plausibly alleged *what* defamatory matter Plaintiffs communicated to *which* third party. *See Gilbert v. WNIR 100 FM*, 756 N.E.2d 1263, 1276 (Ohio Ct. App. 2001) ("Any act by which the defamatory matter is communicated to a third party constitutes publication." (quotation omitted)). That failure also precludes the Court from discerning whether it is plausible that the counterclaim can overcome Plaintiffs' privilege defense. In

sum, the paucity of the allegations renders the claim inadequately pleaded. So the Court must dismiss this counterclaim, too.

One other thing bears noting. Because Defendants could perhaps cure the above-mentioned deficiencies with additional factual allegations, the Court will dismiss the Counterclaims without prejudice. If Defendants can in fact cure the deficiencies (and wish to do so), they may move for leave to amend their Counterclaims within thirty days of this Opinion and Order.

## CONCLUSION

For all these reasons, the Court **GRANTS** Plaintiffs' Motion to Dismiss Defendants' Counterclaims (Doc. 9) and **DISMISSES WITHOUT PREJUDICE** Defendants' Counterclaims (Doc. 7). If Defendants believe they can cure the pleading deficiencies identified above, they have thirty days to move for leave to amend their Counterclaims and should attach a copy of the proposed pleading to that motion.

**SO ORDERED.**

April 7, 2025
**DATE**                                     **DOUGLAS R. COLE**
                                              **UNITED STATES DISTRICT JUDGE**

14